[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11232
Non-Argument Calendar

_____

D.C. Docket No. 8:17-cr-00192-SDM-JSS-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAILE RODRIGUEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 12, 2019)

Before MARCUS, ROSENBAUM and JULIE CARNES, Circuit Judges.

PER CURIAM:

Jaile Rodriguez appeals his convictions and sentences after a district court

found him guilty of one count of conspiring to possess more than five kilograms of

cocaine with intent to distribute, in violation of 21 U.S.C. § 846; and one count of

possessing more than five kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).  Rodriguez argues that the district court erred in: (1) denying his motion to suppress because he was subjected to both an unlawful arrest and an unreasonable search of his truck; and (2) denying him a one-point reduction to his offense level under U.S.S.G. § 3E1.1(b).  After careful review, we affirm.

In reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error, and its application of the law to those facts de novo. United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012).  We construe all facts in the light most favorable to the prevailing party, and afford substantial deference to the factfinder's credibility determinations, both explicit and implicit. Id.  We must accept the version of events adopted by the district court "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (quotations omitted).  We review a sentencing court's application of the Sentencing Guidelines de novo, and its findings of facts for clear error.  United States v. Maitre, 898 F.3d 1151, 1159 (11th Cir. 2018).  We are bound by prior binding precedent unless it is overruled by us sitting en banc or by the Supreme Court. United States v. Vega-Castillo, 540 F.3d 1235, 1236 (11th Cir. 2008).

First, we are unpersuaded by Rodriguez's claim that his arrest was unlawful. The Fourth Amendment protects against unreasonable searches and seizures, and in

assessing the reasonableness of a search or seizure, we consider the totality of the circumstances. Lewis, 674 F.3d at 1303. A person is "seized" when, by means of physical force or show of authority, his freedom of movement is restrained. United States v. Mendenhall, 446 U.S. 544, 553 (1980). Under Terry v. Ohio, 392 U.S. 1 (1968), law enforcement officers may seize a suspect for a brief, investigatory stop "where (1) the officers have a reasonable suspicion that the suspect was involved in . . . criminal activity, and (2) the stop was reasonably related in scope to the circumstances which justified the interference in the first place." Lewis, 674 F.3d at 1303 (quotations omitted). Reasonable suspicion requires more than a hunch, but does not require that the officers observed the illegal activity. Id. Reasonable suspicion is determined from the collective knowledge of the officers involved in the stop. United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989). "[W]hen the totality of circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required." United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986).

We apply four non-exclusive factors to delineate between a Terry investigatory stop and an arrest: (1) "the law enforcement purposes served by the detention," (2) the police's diligence in pursuing the investigation, (3) "the scope and intrusiveness of the detention," and (4) "the duration of the detention." United States v. Acosta, 363 F.3d 1141, 1146 (11th Cir. 2004). As for the first factor, the

3

most important consideration is whether the police detained the defendant to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference, and we must decide if officers used brief, minimally intrusive techniques appropriate under Terry. Id. Under the second factor, we ask "whether the methods the police used were carried out without unnecessary delay." Id. We've found no unnecessary delay when "[e]ach investigatory act logically led to the next act." Id. The third factor requires the weighing of the scope and intrusiveness of the detention against police officers' need to ensure their safety, and "officers may take reasonable steps to ensure their safety so long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." Id. at 1146-47 (quotations omitted). An investigatory stop does not necessarily turn into an arrest if a suspect is handcuffed, ordered to lay down on the ground, or secured in the back of a police car. Id. at 1147. As for the fourth factor, we look to "whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Id. "There is no rigid time limitation or bright line rule regarding the permissible duration of a Terry stop," and we've held that stops between 30 and 75 minutes are "not beyond the pale of reasonableness for Terry stops." Id. at 1147-48.

4

Here, Rodriguez did not undergo an unreasonable seizure. For starters, law enforcement officers had a reasonable suspicion that he was involved in criminal activity. See Lewis, 674 F.3d at 1303. Evidence presented at the suppression hearing revealed that officers knew that: (1) Rodriguez's co-conspirator, Julio Cesar Rifat, was planning a seven-kilogram cocaine transaction; (2) Rifat typically worked with others when he did his drug transactions; (3) Rifat met with Rodriguez and Garcia at a residence the morning of the planned transaction; (4) Rifat left alone from the residence and did not have the cocaine in his car; (5) Rodriguez and the third co-conspirator, Yaniel Garcia, left the residence shortly afterward and drove toward the transaction meeting place; (6) when Rifat and Garcia got out of their truck at the area of the transaction meeting place, they seemed apprehensive about being followed; (7) they made furtive movements after the special agent, Brandon Cain, showed them his badge; and (8) Rodriguez told officers that he had just been dropped off at that location, which did not match what the agent had just observed. Based on this evidence, law enforcement had more than a hunch that Rodriguez might be involved in Rifat's cocaine transaction, and the investigatory stop was more than reasonable. See id.

Nor did Rodriguez's seizure morph into an unwarranted arrest. As the record reflects, the K-9 unit was parked right across the street from the truck and was summoned before Cain even approached Rodriguez, which allowed the K-9 officer

and the canine, Dexter, to come right over for Dexter to sniff the truck. As a result, the investigation proceeded as quickly as possible, and there was no unnecessary delay in waiting for Dexter to arrive and sniff the truck. See Acosta, 363 F.3d at 1146. Further, Special Agent Cain explained that officers had placed Rodriguez in handcuffs, sat him on the ground, and moved him based on Cain's belief that officer safety was in danger due to the large quantity of cocaine involved and on Rodriguez and Garcia's movements after they saw his badge, regardless of whether they had any weapon. See id. at 1146-47. Because a reasonable factfinder could believe Cain's testimony, we will not overturn the district court's determination that his reason was credible, and as we've said before, a law enforcement seizure does not turn into an arrest simply because an individual is handcuffed, moved, and forced to sit on the ground. See Lewis, 674 F.3d at 1303; Acosta, 363 F.3d at 1147; Ramirez-Chilel, 289 F.3d at 749. Moreover, construing the facts in the light most favorable to the government, as we must, the delay was only ten minutes or less between Rodriguez's detention and Dexter's exterior sniff of the vehicle, which is far below other time limits we've deemed reasonable. See Acosta, 363 F.3d at 1147-48.

We also are unconvinced by Rodriguez's claim that the search of his truck was unlawful. Generally, the Fourth Amendment requires law enforcement to obtain a warrant from an independent judicial officer prior to conducting a search. California v. Carney, 471 U.S. 386, 390 (1985). However, if a vehicle is readily

6

mobile and there is probable cause to believe that it contains contraband, law enforcement may search the vehicle without a warrant.  United States v. Baldwin, 774 F.3d 711, 720 (11th Cir. 2014).  This automobile exception does not contain a special exigency requirement beyond a showing that the vehicle is mobile.  United States v. Watts, 329 F.3d 1282, 1285 (11th Cir. 2003).  Mobility is inherent if the vehicle "reasonably appear[s] to be capable of functioning."  Id. at 1286 (quotation omitted).  "[P]robable cause arises when a drug-trained canine alerts to drugs." United States v. Tamari, 454 F.3d 1259, 1265 (11th Cir. 2006) (quotations omitted).

To show a drug-detection dog's reliability, the government need not satisfy multiple, inflexible, independent evidentiary requirements.  Florida v. Harris, 568 U.S. 237, 245 (2013).  Rather, the Supreme Court has instructed courts to determine the reliability of a drug-detection dog based on controlled-testing environments, a "satisfactory performance in a certification or training program," and "if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs."  Id. at 246-47.  A defendant must have the opportunity to challenge the drug-detection dog's reliability by cross-examining a testifying officer, showing that the standards of a certification or training program are too lax, examining the dog's and handler's history in the field, or pointing out unique circumstances about a particular alert that would damage its reliability.  Id. at 247. A court should find probable cause if the government has presented uncontested

7

evidence that the dog performs reliably in detecting drugs. Id. at 248. However, if the defendant challenges the dog's reliability, the court should weigh the competing evidence. Id. Ultimately, we ask "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Id.

In this case, the search was not unreasonable because Rodriguez's truck, which he had driven minutes prior to the search, was readily mobile, and Dexter had alerted to the odor of narcotics while sniffing outside of it, giving the officers probable cause to believe it contained contraband. See Baldwin, 774 F.3d at 720; Tamari, 454 F.3d at 1265; Watts, 329 F.3d at 1285. Further, the K-9 officer's testimony proved that Dexter was a reliable drug-detection dog because he had completed a 400-hour initial training, he had completed monthly 16-hour trainings, his certification with the North American Police Working Dog Association was current, and he had only given false alerts a total of 12 to 15 times out of 200. See Harris, 568 U.S. at 246-47. Rodriguez also had the opportunity to challenge Dexter's reliability by questioning his training and certification during his cross-examination of the K-9 officer, but Rodriguez did not present any conflicting evidence. See id. at 247. In addition, the district court's implied conclusion that the K-9 officer's testimony about Dexter's training was credible is not contrary to nature and is one that a reasonable factfinder could make. See Lewis, 674 F.3d at 1303;

8

Ramirez Chilel, 289 F.3d at 749.  On this record, there was probable cause of contraband when Dexter alerted at Rodriguez's truck.  See id. at 248.

As for Rodriguez's claim that the K-9 officer misinterpreted Dexter's alerts, it's meritless.  The officer testified that he had over 20 years' experience with drug-detection dogs, he had worked with Dexter for over two years before Dexter alerted at Rodriguez's truck, and he attended the same trainings as Dexter.  What's more, at trial, Rodriguez's counsel expressly declined to "heavily" question the officer about Dexter's alerts.  Construing the facts in the light most favorable to the government, the K-9 officer had the necessary training and capability to understand when Dexter alerted and when he made an innocuous movement.  See Lewis, 674 F.3d at 1303.

Finally, we reject Rodriguez's claim that the district court erred by not reducing his sentence pursuant to U.S.S.G. § 3E1.1(b). Section 3E1.1(b) provides:

> If the defendant qualifies for a decrease under subsection (a) . . . and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1(b).  "Because the [g]overnment is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, an adjustment under subsection (b) may only be granted upon a formal motion by the [g]overnment at the time of sentencing."  U.S.S.G. § 3E1.1, comment. (n.6).

9

We've held that a government motion is required for the one-point reduction under U.S.S.G. § 3E1.1(b).  United States v. Wade, 458 F.3d 1273, 1282 (11th Cir. 2006).

Here, Rodriguez's argument is squarely foreclosed by our binding precedent and the plain language of the Sentencing Guidelines that a one-level reduction under § 3E1.1(b) is only available after the government files a formal motion, and no motion was filed in this case.  See Wade, 458 F.3d at 1282; U.S.S.G. § 3E1.1(b); U.S.S.G. § 3E1.1, comment. (n.6).  Rodriguez nevertheless says that because the government did not have to prepare for trial, he is entitled to the one-level reduction anyway.  But this argument is without merit.  Among other things, the government litigated the suppression hearing and prepared for a jury trial.  Accordingly, we affirm.

**AFFIRMED**.